IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 18, 2020 Session

# IN RE ROSYLYN W.[1]

**Appeal from the Chancery Court for Hawkins County**
**No. 2018-AD-45      Douglas T. Jenkins, Chancellor**

_____

## No. E2019-01838-COA-R3-PT
_____

Sarah E. ("Mother") and Scott W. ("Father") appeal the termination of their parental rights to their minor child, Roslyn W. ("the Child"). In September 2018, Michael D. ("Uncle") and Megan D. ("Aunt") (collectively, "Petitioners") filed a petition to terminate the parental rights of the parents to the Child in the Hawkins County Chancery Court ("Trial Court"). The Trial Court conducted a trial in August 2019. Following the close of Petitioners' proof, the Trial Court involuntarily dismissed the statutory ground of abandonment for failure to visit against both parents upon oral motion by the parents, pursuant to Tennessee Rule of Civil Procedure 41.02. At the conclusion of the trial, the Trial Court terminated Mother's parental rights based on the statutory grounds of abandonment by failure to support the Child and failure to manifest an ability and willingness to assume custody or financial responsibility of the Child. The Trial Court terminated Father's parental rights on the ground of abandonment by failure to support the Child. The Trial Court further found that termination of Mother's and Father's parental rights to the Child was in the Child's best interest. Upon its termination of the parents' rights to the Child, the Trial Court ordered that Petitioners and the parents must enter into an agreed order or a "preadoption contract" that will survive the adoption to allow for reasonable visitation between the Child and the parents to continue their relationship. Both Mother and Father timely appealed the Trial Court's judgment. The Petitioners raise two additional issues. We reverse the Trial Court's involuntary dismissal of the statutory ground of abandonment by failure to visit pertaining to Father at the conclusion of Petitioner's proof, as well as the requirement that the parties enter into an agreed order or "preadoption contract" allowing reasonable visitation between the parents and the Child after the adoption. We affirm the Trial Court's judgment in all other respects, including the termination of Mother's and Father's parental rights.

_____

[1] Although the Child's first name is spelled "Rosylyn" in the style of the case as reflected in our records, the Child's name is spelled "Roslyn" throughout the Trial Court's proceedings, except Mother's notice of appeal to this Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

William E. Phillips, II, Rogersville, Tennessee, for the appellant, Sarah E.

Gregory W. Francisco, Kingsport, Tennessee, for the appellant, Scott W.

Thomas M. Leveille, Knoxville, Tennessee, for the appellees, Michael D. and Megan D.

## OPINION

### Background

In March 2015, the Tennessee Department of Children's Services ("DCS") filed a petition to transfer temporary legal custody of the Child to Petitioners in the Hawkins County Juvenile Court ("Juvenile Court") due to possession of drugs by Mother and drug use by Father. At the adjudicatory hearing, the parents stipulated that the Child was dependent and neglected. Based on that stipulation, the Juvenile Court found by clear and convincing evidence that the Child was dependent and neglected. Custody was to remain with Petitioners, and the parents were awarded unsupervised daytime visits with the minor child at the discretion of Petitioners.

Both parents visited the Child frequently in the beginning after Aunt received custody of the Child. During the four-month time period prior to the petition's filing, Mother had continued visiting the Child about once or twice a month. Although Father had visited consistently for a while, Aunt testified that Father had not visited the Child at all during the four-month period and that she had not denied him visitation. Father had moved to Georgia in March 2018 to be closer to his girlfriend and for a job opportunity. Father was supposed to return to Tennessee in late June or early July 2018 to visit the Child, but he did not come. According to Father, he was unable to come because his wife was pregnant, had been sick, and was hospitalized on and off throughout the pregnancy.

On cross examination, Aunt acknowledged that Father had visited with the Child while the Child was visiting the paternal grandmother but that she had not kept track of those days. Aunt testified that Father had not visited the Child at the paternal grandmother's home the year before trial but that she did not know if Father had spoken to the Child on the phone while at the grandmother's home during that time. Aunt further testified that the Child was only at the paternal grandmother's home "maybe two nights"

during the four-month period. Aunt denied that Father had a meaningful relationship with the Child and stated that the Child had barely talked to Father the year prior to trial.

It is undisputed that there is no court order requiring the parents to pay child support for the Child. The parents would give Aunt pull-ups, diapers, and wipes for the Child for a while after the Child was placed with Aunt. Aunt testified that she received no financial support from Father from May 14, 2018, through September 13, 2018, but that Father had sent the Child a birthday gift in June 2018. According to Father, the Child's birthday gift, a "power wheel dune buggy," cost $300. Concerning Mother, Aunt testified that she had not received any financial support from Mother during that same four-month time period. According to Aunt, Mother also had bought the Child a birthday gift, but Aunt had received no money from her for the Child. When Mother visited, she often would bring small knickknack items to the Child to the point that Aunt asked the Mother to stop bringing them because, according to Aunt, the Child would always expect something everywhere she went. Aunt testified that Mother sometimes would take the Child shopping and to restaurants but had visited only at Aunt's home since April 2018.

According to Aunt, the Child was attached to Aunt, Uncle, and their other children in her home and viewed the other children as siblings. Aunt testified that the Child refers to her as "mommy" and to Uncle as "daddy." The Child also knows Mother and Father are her parents and refers to them sometimes by their names and sometimes as "mommy" and "daddy." According to Aunt, the Child had "severe problems" at twenty months old when she came to live with them. Aunt explained that the Child would scream if she was left in a room and that the Child was "delayed a lot." Aunt testified that the Child is still delayed and that the Child "was an NSA [sic] baby, so that has caused her to have some problems, speech problems, school problems and is in special education." Aunt testified that if the parents' rights were terminated, she would not completely cut the parents off from the Child and denied that she would discourage a relationship between the parents and the Child.

By the time of the termination trial, Father was married, had another baby, and had obtained employment. Father testified that he stopped sending Aunt support within the first six months when the Child "essentially stopped living at [Aunt's] and started living at [the paternal grandmother's home]." After that time, Father testified that he delivered support to the paternal grandmother and visited the Child there. Father testified that he had visited the Child often and the Child had stayed frequently at his home before he moved. According to Father, he had provided support for the Child to paternal grandmother up until the time he left to go to Georgia.

Father testified that he made $35,000 in 2018. Father's 2018 joint tax return reflected a total income of $81,404, and he stated that his wife made more money than him. Father testified that from May 2018 through September 2018, he was making $19.04 per hour working forty hours per week and acknowledged that he had not paid child support

during that time. Father testified that during the four-month time period, his entire income went to paying rent to his wife, car insurance, day-to-day expenses, and legal fees and that he could not afford to pay support for the Child. Father's wife testified that his portion of the rent was that he paid the utility bills during that time period.

Father testified that when the Child was placed with Aunt, he had failed a drug test for opioids and opiates for which he did not have a prescription. When asked about his drug use, he testified: "I used pharmaceutical opiates bi-weekly until March of 2015. I used opiates from September 2015 to November of 2015, and then I smoked marijuana from September of 2017 to October of 2017." Father had passed a drug screen in April 2015. Father testified that DCS sent him to the VA for an alcohol and drug assessment but that the VA did not provide that service. According to Father, he had attempted to complete the assessment and could pass a drug test on the date of trial.

Mother was not working from May 14, 2018, through September 13, 2018. When asked why she was not working, Mother testified that she suffered from anxiety and depression due to rheumatoid arthritis and fibromyalgia. Mother testified that she was able to work as an artist or do odd jobs and made minimal income from those. She could not recall how much money she made but "it wasn't a lot." Mother testified that she worked at T-TEC from October to December 2018 but was laid off. Additionally, Mother testified that she had worked at KFC and ACT but does not recall the time period when she worked at KFC. Mother testified that she had not applied for disability because she wanted to work and was able to work.

During the relevant four-month period, Mother had a phone bill, insurance bill, and medical bills. Mother testified that she paid those bills herself but that her mother would help her some because Mother helped care for her and the house. According to Mother, when she asked to help pay support or whether Petitioners needed anything for the Child, "it's somewhat refused." Mother testified that she tried to provide groceries, outfits, toys, and presents for the Child. According to Mother, she paid small amounts of cash to Aunt in the first and second year. Mother testified that the Child "may have stayed at [the paternal grandmother's] the first two years." According to Mother, she had visited and spoken to the Child at the paternal grandmother's home. Mother testified that she also had provided some support to the grandmother.

During her visits, Mother took the Child to the park, shopping, and out to eat. Mother testified that there were times she asked to visit the Child but was not allowed to do so. Mother testified that she always visited when she was allowed. Mother acknowledged during cross examination that she had not attended two recent visits with the Child and stated that she was sick. Mother had passed a drug screen in April 2015. Mother testified that she completed an alcohol and drug assessment at Camelot in Colonial Heights and completed the recommendations from that assessment. According to Mother, she could pass a drug screen at the time of trial. Mother testified that she had addressed

- 4 -

some of her medical issues and was currently addressing others, had stable housing, and was in the process of securing employment with a banking organization. Mother explained that she had not filed a petition to return custody to her because she was waiting until she had her own apartment, which she did not have at the time of trial. Mother acknowledged that she needed to get herself "established more" before regaining custody of the Child. Mother testified that she wanted Father to have custody of the Child.

Father had filed a petition to return custody to him in July 2018. On September 14, 2018, Petitioners filed a petition to terminate Mother's and Father's parental rights in the Trial Court. Aunt acknowledged during trial that they filed the termination petition in response to Father's custody petition because she believed it was not in the Child's best interest to go live with Father in Georgia. As grounds for the termination of the parents' rights, Petitioners alleged that the parents had abandoned the Child by failing to visit and financially support the Child for four months prior to the termination petition's filing and that both parents had failed to manifest an ability and willingness to assume custody or financial responsibility for the Child.

In February 2019, Father filed an answer denying that grounds existed to terminate his parental rights. In his answer, Father averred that he had been denied visitation with the Child, that he had filed a petition for custody, that child support had not been ordered by the court, and that he had offered to pay child support but had been refused. Mother filed an answer in August 2019 also denying that grounds for termination existed to terminate her parental rights to the Child. Mother raised as affirmative defenses that any failure to visit or support on her part was not willful.

The Trial Court conducted a trial in August 2019. In September 2019, the Trial Court entered its "Memorandum Opinion Containing Findings of Fact and Conclusions of Law," in which the Trial Court found as follows:

> All parties agreed at trial, and the Court finds, that the period of May 14, 2018 through September 14[2], 2018 is the relevant four month period for the abandonment analysis.
>
> As noted by the Court during the trial, the ground "failure to visit" was dismissed on a Rule 41 of T.R.C.P[.] Motion for Involuntary Dismissal at the close of [Petitioners'] proof. As to the Mother, she has always maintained visitation – sometimes regular and sometimes sporadic – but she maintained visitation with the child. She visited as many as 8-10 times during the period of May 14, 2018 through September 14, 2018. The Court believes, summarily, that this is fatal [to] the Petition as to Mother's alleged abandonment by "failure to visit". With respect to the Father's failure to visit

---

[2] The relevant four (4) month period is May 14, 2018 through September 13, 2018. [Footnote added.]

– on July 31, 2018 the Father filed a petition to return the child to him. The Court notes that the Father did not visit during the four month period; however, the Father was asserting his rights to the child. His failure was not willful and he was litigating for his right to visit. For these reasons, and the reason(s) stated during the trial, the alleged abandonment for failure to visit was dismissed at the close of the Petitioner's proof.

With respect to the ground of failure to support, the Court finds that both parents failed to pay support during the period of May 14, 2018 through September 14, 2018. The Father was gainfully employed and making a good deal of money during this time. The Father chose to pay other obligations including "rent to his wife" rather than pay any monetary support toward the care and upkeep of the minor child at issue in these proceedings. With respect to the willfulness of the Mother, the Mother gave unrebutted testimony that she was physically ill during the period of May 14, 2018 through September 14, 2018; however, the Court does not find the Mother's testimony completely credible with regard to her burden of proof on the affirmative defense of lack of willfulness. The Mother was paying all of her other obligations which included a cell phone bill and medications. There is no indication from the Mother where the money for these things came from other than she sporadically worked as an artist and other odd jobs. The Court does not find her testimony that she could not pay some monetary amount during the salient four month period credible. The Petition is sustained as to both parents in regard to failure to support based on clear and convincing evidence of failure to pay, and both failed to carry their burden of proof of a lack of willfulness.

With respect to the third ground, T.C.A. §36-1-113(g)(14), the Court finds that this ground is not sustained as to the Father because the Father has improved his conditions such that he is in a position to assume financial responsibility and he is asking the Court to do so. However, with respect to the Mother the Court finds that this ground is sustained as a second ground upon which to terminate the Mother's rights. The Mother freely admits that while she does not want her parental rights to be terminated, she cannot take the child at this time. Also, with respect to the second prong of this ground – that placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child – the Court finds that this ground has been sustained by the proof, particularly the Mother's admissions that she cannot yet provide and care for the child without help. The Petitioners provide the child with a stable home. The Mother freely admitted this and actually thanked the Petitioners from the witness stand. The Mother is a very challenged individual. She is doing the best she can and the Court does not find that she is a bad person; however, it

is obvious, as the Court has observed, that she struggles mightily to take care of herself. She freely admitted from the witness stand that there were many challenges in her life. From the Court's observation of her, the Court agrees with her that she is not capable at the present time of taking care of this child without help from some other person. Given the Mother's admissions from the witness stand and the testimony of the Petitioner, the Court does not believe that she can presently take care of the child. Therefore placing the child in her physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. All of the above findings are made by clear and convincing evidence.

Finding grounds to sustain the petition, the Court proceeds now to consider the best interest of the child pursuant to T.C.A. §36-1-113(i). For organization, the Court will first go through the factors with respect to the Father first:

1. The Court does find that the Father has made an adjustment of circumstance in his life, albeit while his sister and brother-in-law were raising his child. Father knows and is confident that his child was loved, fed and provided for. The Court finds that all the child's need were in fact met by the Petitioners while they had the child in their custody. Petitioners also have other children in the home that are well parented. The Court cannot escape the conclusion after observing the Father and his wife in Court that they could parent the subject minor child. The Court finds that factor number one weighs against termination;

2. The Court does not believe this factor applies to these proceedings;

3. The Court finds that this factor weighs in favor of termination as the Father has not maintained regular visitation or contact with the child through the years;

4. The Court finds that there is not a meaningful relationship presently existing between the father and child. A mere acquaintance and recognition of a person does not, in the Court's mind, amount to a "meaningful relationship". The Court finds that this factor weighs in favor of termination;

5. The Court finds that the effective change in caretakers and physical environment is likely to have a very negative effect of the child's emotional, psychological and medical condition at this point in her life. Therefore, this factor weighs in favor of termination;

6. This factor weighs in favor of termination as the Father has been found guilty in the past of neglect towards the child;

7. This factor weighs in favor of termination. The present existing environment is very much healthy and safe;

8. The Court finds that this factor weighs against termination;

9. The Court finds that this factor weighs in favor of termination in that the Father has never been ordered to pay child support but also has never willingly paid any child support that amounts to "guideline support";

    With respect to the application of the best interest factors to potential termination of the Mother's parental rights, the Court finds as follows:

1. The Court finds that this factor weighs in favor of termination because, as noted above, the Mother has not made an adjustment of circumstance to where she could safely have the child returned to her;

2. The Court does not believe this factor applies to these proceedings;

3. The Court finds that this factor weighs against termination as the Mother has maintained regular visitation or contact with the child through the years;

4. The Court finds that this factor weighs against termination as the Mother has maintained regular vitiation or contact with the child through the years;

5. The Court finds that the effective change in caretakers and physical environment is likely to have a very negative effect of the child's emotional, psychological and medical condition at this point in her life. Therefore, this factor weighs in favor of termination;

6. This factor weighs in favor of termination as the Mother has been found guilty in the past of neglect towards the child;

7. This factor weighs in favor of termination. The present existing environment is very much healthy and safe;

8. The Court finds that this factor weighs against termination;

9. The Court finds that this factor weighs in favor of termination;

The Court finds overall that the factors weighing in favor of termination outweigh the factors against. The Court finds by clear and convincing evidence that termination is in the child's best interest, and the parental rights of both the Mother and the Father should be terminated. The overriding factors are the stability, nurturing, and dependability of the Petitioners (particularly [Aunt]).

[Aunt] testified from the witness stand under oath that she intended to continue the relationship through visitation of the child with both the Mother and Father. Given the Father's great improvement of his life circumstances, and the relationship that has always been maintained by the Mother, the Court does not find the Petitioner's statement of intention to continue the relationship with both parents to be detrimental nor in any way against the best interest of the subject minor child – so long as the Petitioners, after adoption, can raise this child without unwelcome interference from the birth parents. The legislature of the State of Tennessee has recently recognized that in many cases it is not only permissible, but encouraged, that an adoptive child's relationship with various relatives should survive the adoption. In this case, the court has not been presented with any agreed contract for future contact between the birth parents and the child; however, the court does feel that the Petitioner should be held to her word. The Court directs the Petitioners to submit to an Agreed Order that will survive the adoption for reasonable visitation between the child and both parents, or submit a preadoption contract pursuant to statute which would provide for a continuation in the relationship with the child and both birth parents. The Court finds and believes that this part of its order is very much in the best interest of the subject minor child; will effect continuity in the child's life; will maintain the status quo regarding limited contact for birth parents; and will hold Petitioner to her word on the witness stand.

(Internal citations omitted.) The Trial Court then directed Petitioners' counsel to prepare a final judgment. The Trial Court subsequently entered an order terminating Mother's and Father's parental rights based on the findings from the memorandum opinion and incorporating the memorandum opinion by reference in the final judgment. The Trial Court also instructed in its judgment that the parties "shall submit to an Agreed Order that will survive the adoption for reasonable visitation between the child and [the parents] or submit to a pre-adoption contract pursuant to statute which would provide for the continuation in the relationship and maintain the status quo regarding limited contact with the child and [the parents]."

Mother and Father subsequently filed notices of appeal with this Court. On appeal, this Court ordered Mother and Father to show cause why this appeal should not be dismissed due to the lack of finality of the Trial Court's judgment. The Trial Court

subsequently entered an order certifying the September 2019 judgment as final for purposes of appeal, pursuant to Tennessee Rule of Civil Procedure 54.02.

## Discussion

Although not stated exactly as such, Mother and Father raise the following issues in their joint brief for our review: (1) whether the Trial Court erred by finding by clear and convincing evidence that Mother and Father abandoned the Child by failing to provide financial support for her, (2) whether the Trial Court erred by finding by clear and convincing evidence that Mother failed to manifest an ability and willingness to assume custody or financial responsibility for the Child, and (3) Whether the Trial Court erred by finding by clear and convincing evidence that termination of Mother's and Father's parental rights was in the Child's best interest. Petitioners raise the following additional issues for our review: (1) whether the Trial Court erred by granting the parents' motion for involuntary dismissal of the statutory ground of abandonment by failure to visit at the conclusion of Petitioners' proof, pursuant to Tennessee Rule of Civil Procedure 41.02, and (2) whether the Trial Court erred by requiring Petitioners to enter into an agreed order or other preadoption contract to continue the relationship between the Child and the parents.

With regard to the termination of parental rights, our Supreme Court has instructed:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it."

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

*Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1113[sic](c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

- 12 -

written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

First, we will address the statutory grounds for termination considered by the Trial Court. The Trial Court considered abandonment concerning both failure to financially support the Child and failure to visit the Child as to both parents. Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2019) provides abandonment by a parent as a ground for the termination of parental rights. We note that the termination petition was filed in September 2018 and that the relevant statute in effect at that time defining abandonment stated as follows in pertinent part:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition

to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A) (Supp. 2019). The relevant statute in effect at the time the petition was filed removed the word "willful" from the definition of abandonment and instead provided as an affirmative defense that the parent's failure to visit or support was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I). To prove this defense, a parent must establish his or her lack of willfulness by a preponderance of the evidence. *Id.* We will address both abandonment grounds in turn. The Trial Court found in its order that the relevant four-month period was May 14, 2018 through September 14, 2018. While we note that the correct four-month period extended from May 14, 2018 through September 13, 2018, it makes no difference in our analysis.

Petitioners raise as an issue whether the Trial Court erred by granting the parents' motion for involuntary dismissal as to the ground of abandonment by failure to visit as applicable to both parents. The parents did not file a reply brief addressing the issues raised by Petitioners concerning the ground of abandonment by failure to visit. Tennessee Rule of Civil Procedure 41.02 provides in pertinent part:

> **(2)** After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. . . . If the court grants the motion for involuntary dismissal, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.

A trial court's decision to grant a Rule 41.02 involuntary dismissal is reviewed pursuant to Tennessee Rule of Appellate Procedure 13(d), which provides that this Court's review of the trial court's findings of fact should be de novo on the record with a presumption of correctness, unless the preponderance of the evidence is otherwise. *Bldg. Materials Corp. v. Britt*, 211 S.W.3d 706, 711 (Tenn. 2007).

Following a motion for involuntary dismissal at the conclusion of the plaintiff's proof, the trial court "must impartially weigh the evidence as though it were making findings of fact and conclusions of law after all the evidence has been presented." *Id.* (internal citations omitted). Motions for involuntary dismissal challenge the sufficiency of the plaintiff's proof. *Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 520 (Tenn. Ct.

- 14 -

App. 2002). The trial court should dismiss the plaintiff's action if the court finds that based on the law and evidence presented, "the plaintiff has failed to demonstrate a right to the relief it is seeking." *In re Adoption of Jordan F.J.*, No. W2013-00427-COA-R3-PT, 2013 WL 6118416, at *3 (Tenn. Ct. App. Nov. 20, 2013) (quoting *Burton*, 129 S.W.3d at 520).

Concerning Mother, the Trial Court granted her Rule 41.02 motion for involuntary dismissal regarding the statutory ground of abandonment by failure to visit. Specific to abandonment by failure to visit, pursuant to Tennessee Code Annotated § 36-1-102(1)(E), a parent must have failed to visit or engage in more than token visitation during the relevant four-month period. Tennessee Code Annotated § 36-1-102(1)(C) defines "token visitation" as visitation that, under the circumstances of the particular case, "constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." The burden of proof was with Petitioners to prove that Mother had failed to engage in more than token visitation with the Child during the four months prior to the petition's filing.

The Trial Court found that Mother had maintained visitation with the Child, although sometimes regular and sometimes sporadic. Aunt testified during trial that Mother had visited with the Child once or twice a month during the four months prior to the petition's filing. The Trial Court found that during the relevant four-month time period, Mother had visited with the Child as much as eight to ten times. At the conclusion of Petitioners' proof, Mother moved for involuntary dismissal, pursuant to Rule 41.02. As such, the Trial Court concluded that Mother had not abandoned the Child by failing to visit her. We find and hold, as did the Trial Court, that Petitioners had not proven by clear and convincing evidence a right to relief on the ground of abandonment by failure to visit against Mother at the conclusion of Petitioners' proof.

The Trial Court also granted Father's Rule 41.02 motion for involuntary dismissal regarding the statutory ground of abandonment by failure to visit. Since the ground of abandonment by failure to visit was dismissed at the conclusion of Petitioners' proof, the only proof before the Trial Court at the time of the Rule 41.02 involuntary dismissal was Aunt's testimony and exhibits presented. Aunt testified during trial that although Father visited consistently during the beginning, Father had not visited at all during the four months prior to the filing of the termination petition. Father had moved to Georgia in March 2018 to be closer to his girlfriend and for a job opportunity. A visit with Father had been scheduled in late June or early July for Father to come to Tennessee and visit with the Child; however, Father did not come to visit the Child. Instead, Father requested that the Child be allowed to come to Georgia for the visit. Aunt testified that she was uneasy with the Child leaving the state. During her testimony, Aunt further acknowledged that she had not kept track of the times Father had visited with the Child while the Child was at the grandmother's home. However, Aunt explained that the Child had only stayed at the grandmother's home "maybe two nights" during the relevant four-month period. The Trial

Court found that Father had not visited the Child during the relevant four-month time period prior to the termination petition's filing.

In granting Father's Rule 41.02 motion, the Trial Court found that Father's failure to visit was not willful. Because lack of willfulness is an affirmative defense to the statutory ground of abandonment, the burden lies with Father to prove the defense by a preponderance of the evidence. *See* Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2019). Father orally moved for involuntary dismissal, pursuant to Rule 41.02, at the conclusion of Petitioners' proof. The Trial Court found that Father had filed a petition to regain custody of the Child in July 2018, during the four-month time period relevant to abandonment. As a result of this petition, the Trial Court found that Father "was asserting his rights to the child" and "litigating for his right to visit" the Child. Therefore, the Trial Court found at the conclusion of Petitioners' proof that Father's lack of visitation with the Child was not willful.

On appeal, Petitioners argue that Father's petition for custody should be a factor for the Trial Court to consider in determining Father's willfulness but that it does not preclude a decision that Father's abandonment was willful. This issue was first addressed by our Supreme Court in *In re Adoption of A.M.H.,* 215 S.W.3d 793 (Tenn. 2007), which was a termination of parental rights action. In that case, the Court held that although the parents had not visited the child during the four months, their failure to visit was not willful. *Id.* at 810. Prior to the four-month period, the parents visited the child at the home of the legal custodians and had become upset when the legal custodians had not allowed the parents to take the Child for family photos. *Id.* The parents refused to leave the Child until the legal custodians contacted law enforcement to remove the parents from the custodian's property. *Id.* The police officer instructed the parents to leave the property. *Id.* The parents then pursued assistance in regaining custody of the child by contacting the local juvenile court and the local media. *Id.* The parents initiated two hearings concerning their petition to regain custody of the child. *Id.* The first hearing was continued at the request of the legal custodians, and the second hearing was thwarted by the termination petition filed by the legal custodians. *Id.*

The Supreme Court in *In re Adoption of A.M.H.* explained that there was enmity between the biological parents resulting from the visits and that the parents had "redirect[ed] their efforts at maintaining a parent-child relationship to the courts." *Id.* at 810. As such, the Court concluded that the evidence did not support a finding that the parents had intentionally abandoned the child. *Id.* This Court later addressed the Supreme Court's conclusion in *In re Adoption of A.M.H.* as holding "that even where a parent has not visited a child in the relevant four-month period, that fact alone is insufficient to support a finding of willful failure to visit where visitation has been thwarted by the other party and the parent is actively pursuing legal proceedings to regain custody or visitation with the child." *In re Brookelyn W.*, No. W2014-00850-COA-R3-PT, 2015 WL 1383755, at *14 (Tenn. Ct. App. Mar. 24, 2015).

Following *In re Adoption of A.M.H.*, this Court applied that rule in *In re Chelbie F.,* No. M2006-01889-COA-R3-PT, 2007 WL 1241252 (Tenn. Ct. App. Apr. 27, 2007). In *In re Chelbie F.*, a father had not visited during the relevant four-month period. *Id.* at 5. However, the father had filed three separate petitions for visitation with the child and was actively litigating the most recent petition in court. *Id.* at *1-2. The parties were in the middle of a hearing on the father's most recent petition when the proceedings were suspended due to the filing of the termination petition. *Id.* at *6. The mother in *In re Chelbie F.* had not encouraged visitation or support from the father. *Id.* Mother had conceded that she did not want the father to visit the child and did not wish to accept financial support from the father for the child. *Id.* According to the mother, she had "decided to 'move on.'" *Id.* Relying on *In re Adoption of A.M.H.*, this Court found that Father's failure to visit was not willful. *Id.*

This Court further examined recent case law interpreting the Supreme Court's holding in *In re Adoption of A.M.H.* as follows:

> Recent cases, however, have distinguished both *In re Adoption of A.M.H.* and *Chelbie*. For example, in *In re Erykah C.,* No. E2012-02278-COA-R3-PT, 2013 WL 1876011 (Tenn. Ct. App. 2013), the Court of Appeals affirmed the trial court's finding of willful failure to visit, even though biological mother had filed a petition to regain custody of the child in the relevant four-month period. In *Erykah,* biological mother alleged that her efforts to visit with the child were rebuffed and that, instead, she was advised to seek judicial intervention. She subsequently filed a petition to regain custody within the four months preceding the filing of the termination petition. On appeal, biological mother argued that there could be no finding that her failure to visit the child was willful because her petition evidenced that she lacked the intent to abandon her child. *Id.* at *5. The Court of Appeals, however, concluded that biological mother was not actively pursuing her custody case, as she missed a court date simply because it was raining that day. *Id.* at *6.
>
> Another recent case distinguished both *In re Adoption of A.M.H.* and *Chelbie, In re Mark A.L.,* No. M2013-00737-COA-R3-PT, 2013 WL 5536801 (Tenn. Ct. App. 2013). In *Mark,* biological father visited two days during the relevant four-month period and filed a petition to set visitation and support one month prior to the filing of the termination petition. Father asserted that based on *In re Adoption of A.M.H.* and *Chelbie,* he could not be found to have willfully failed to visit. The Court of Appeals disagreed, explaining:

[Biological] [f]ather relies on *In re Adoption of A.M.H.,* 215 S.W.3d 793 (Tenn. 2007) and *In re Chelbie F.,* No. M2006-01889-COA-R3-PT, 2007 WL 1241252 (Tenn. Ct. App. Apr. 27, 2007). In that case [i.e., *In re Adoption of A.M.H.*] the parents were actively pursuing visitation within the courts during the pertinent four-month period and, importantly, the parents had continually visited and maintained a relationship with their child while she was in temporary foster care. *In re Adoption of A.M.H.,* 215 S.W.3d at 798. The record before us reveals that [biological] [f]ather did not actively or continually visit or maintain a relationship with the child at any time. Thus, Father's reliance on *In re Adoption of A.M.H.* is misplaced.

Moreover, [biological] [f]ather's reliance on *Chelbie F.* is also misplaced. In that case the father failed to support or visit with his child for approximately seven years. *In re Chelbie F.,* 2007 WL 1241252 at *1. However, the court found that despite this failure, the father did not willfully abandon his child because he had actively sought visitation rights through the courts for seven years. *Id.* at *6. In fact, the father had filed three petitions for visitation over the seven year period after the mother had concealed the child's whereabouts, discouraged his efforts to visit the child, and spurned his efforts to provide financial support. *Id.* Moreover, the mother admitted that she did not want the father to visit with the child or to provide financial support. *Id.* For these reasons, the court found no abandonment. *Id.* Under the facts of this case, [m]other never excused payment of child support nor did she interfere with or deny visitation, a fact clearly evident from the liberal visitation, including extended trips granted to [g]randmother. Although there is some testimony from the witnesses that indicates a lack of communication, there was no outward denial or refusal to visit. Further, as noted above, [biological] [f]ather failed to accompany [g]randmother on her frequent visits. Accordingly, [biological] [f]ather's visitation was nothing more than token. Tenn. Code Ann. § 36-1-102(1)(C).

The trial court found that the petitioners proved by clear and convincing evidence that [biological] [f]ather failed to make any significant effort to visit the child or maintain a relationship with him. [Biological] [f]ather admitted that, in the past four years, he has seen the child a mere six to eight times. Moreover, [biological] [f]ather made only one attempt to visit

the child during the pertinent four-month period.  As the trial court correctly noted, if it were not for [g]randmother's efforts, [biological] [f]ather would have had no contact with child during the past four years.

*Mark,* 2013 WL 5536801, at \*6-\*7.  Thus, the *Mark* Court held that *In re Adoption of A.M.H.* was inapplicable because biological father was "not actively or continually" visiting with the child prior to filing of his visitation petition.  In addition, the *Mark* Court concluded that *Chelbie* offered no support to Father's case, as unlike in *Chelbie*, there was no evidence that the custodial parent spurned biological father's efforts to visit or support the child.

In another case, *In re Adoption of Angela E.,* 402 S.W.3d 636 (Tenn. 2013), the Tennessee Supreme Court concluded that despite the fact that biological father had filed a visitation petition in the years preceding the termination petition, biological father could be found to have willfully failed to visit the child.  The record showed that while Father filed his petition to reinstate his visitation, he took no further action to pursue the matter.  Further, biological father "had no reasonable excuse for failing to pursue the petition to reinstate visitation during those two years."  The Court concluded that it simply was not a case where a parent was "actively trying to maintain visitation" unlike *In re Adoption of A.M.H.* and *Chelbie. Angela,* 402 S.W.3d at 642.

Other courts in dealing with similar arguments on the part of biological parents have characterized the decisions in *In re Adoption of A.M.H.* and *Chelbie* as being based on "circumstances in which the child's custodians discouraged the biological parents from visiting the child and were, to some extent, responsible for the parents' failure to visit during the pertinent four-month period."  *In re Keri C.,* 384 S.W.3d 731, 752 (Tenn. Ct. App. 2010); *see also In re Kadean T.,* No. M2013-02684-COA-R3-PT, 2014 WL 5511984, at \*3 (Tenn. Ct. App. Oct. 31, 2014) (no perm. app. filed) (citing *A.M.H.* for the proposition that a custodial parent may not actively "thwart" the visitation of another parent); *In re Taliah L.B.,* No. E2012-02102-COA-R3-PT, 2013 WL 1319573, at \*9 (Tenn. Ct. App. Apr. 2, 2013) (citing *A.M.H.,* and affirming finding of willful failure to visit in spite of testimony that biological mother consulted with juvenile court about regaining custody of the child prior to filing of termination petition, as the limitations placed on visitation by custodial parents did not amount to significant interference with biological mother's visitation).  These courts have concluded that the custodial parents' actions in *In re Adoption of A.M.H.*

and *Chelbie* involved some "impediment" to the biological parent's visitation. *Keri,* 384 S.W.3d at 753.

*In re Brookelyn W.*, 2015 WL 1383755, at *15-17. Following its recitation of case law on point, this Court in *In re Brookelyn W.* proceeded to affirm the trial court's finding that the parent's failure to visit was willful, despite the parent's filing of a visitation petition, due to a lack of evidence that the parent's visitation had been thwarted, a lack of affirmative efforts by the biological parent to visit the child, and a lack of valid excuse for the delay in filing his visitation petition. *Id.* at *17-18.

Additionally, we note the petitioners in the foregoing analyzed case law maintained the burden of proving that the parents' failure to visit was willful. Since then, our General Assembly has amended the statutory definition of abandonment to remove the requirement for the petitioners to establish the failure to visit to be willful and shifted the burden to the parent to prove his or her failure to visit was not willful as an affirmative defense. *See* Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2019).

In the present case, the Trial Court granted Father's Rule 41.02 motion for involuntary dismissal of the ground of abandonment by failure to visit. In granting that motion, the Trial Court found that Father had filed a petition to regain custody of the Child. Although acknowledging that Father had not visited during the relevant four-month period, the Trial Court found that Father "was asserting his rights to the child." The Trial Court further found that Father's failure to visit "was not willful and he was litigating for his right to visit." The Trial Court made no other findings of fact concerning this ground and relied solely on Father's filing of the custody petition in its reasoning.

The Trial Court's grant of the Rule 41.02 motion was based solely on Petitioners' proof, which included Aunt's testimony and exhibits thereto. The Juvenile Court record, which included the dependency and neglect proceedings and Father's petition to regain custody, were made exhibits by agreement of the parties. The Trial Court determined that Father had not visited the Child during the relevant time period. As such, the question at issue is whether sufficient evidence had been presented to demonstrate by a preponderance of the evidence that Father's failure to visit was not willful.

During trial, Aunt testified that she had never prevented Father from visiting the Child. In fact, Aunt testified of a scheduled visit for Father during the four-month period. According to Aunt, Father was supposed to come to Tennessee to visit the Child in late June or early July but that he did not come for that visit. Instead of coming to visit the Child in Tennessee, Father had requested that the Child come visit him in Georgia. Aunt testified that she did not allow the Child to go to Georgia and had informed Father he could not take the Child after he moved out of Tennessee because she "was worried he wouldn't bring [the Child] back." According to Aunt, Father informed her that when he moved to Georgia, he would be back to visit the Child in Tennessee every week or every other week

- 20 -

but that he had not done that. Aunt acknowledged during trial that Father had filed a petition seeking to regain custody of the Child and that Petitioners had subsequently filed their termination petition.

Concerning willfulness, the Trial Court made no findings of fact to support its decision that Father's failure to visit was not willful other than Father's filing of a petition to regain custody. Upon review of the case law on this matter, it is clear that the simple act of filing a petition for visitation or custody does not preclude a finding that the parent had abandoned his or her child by failing to visit the child. The filing of such a petition is, indeed, a relevant factor for the trial court to consider when making its determination concerning whether the parent's failure to visit or support the Child was willful. It, however, is not the only factor to be considered. Additionally, because this action was filed after the 2018 amendment of Tennessee Code Annotated § 36-1-102(1)(I), the burden of proof was with Father to demonstrate that his failure to visit was not willful. The evidence presented at the conclusion of Petitioners' proof was not sufficient for Father to meet his burden of proving by a preponderance of the evidence that his failure to visit was not willful. Therefore, we reverse the Trial Court's grant of Father's Rule 41.02 motion for involuntary dismissal of the statutory ground of abandonment by failure to visit against Father. We, however, further find that a remand to the Trial Court for further consideration of this ground to be unnecessary due to our ultimate conclusion affirming the termination of Father's parental rights on another ground.

Mother and Father raise as an issue on appeal whether the Trial Court erred by finding by clear and convincing evidence that each of them abandoned the Child by failing to financially support her. As to Mother, the Trial Court found that she had not supported the Child at all during the relevant four-month period. Mother argues that she had provided "in-kind support for the child to the best of her ability through the purchase of gifts, food, clothing, and outings." Mother testified during trial to bringing the Child gifts, clothing, and groceries and to taking the Child shopping and out to eat. Aunt, however, testified that Mother had provided no monetary support for the Child during the four months prior to the filing of the termination petition. Aunt further testified that she did not recall receiving any monetary support for the Child from March 2015, after initially receiving custody of the Child, through May 2018. Aunt acknowledged that Mother had purchased diapers and supplies in the first year Aunt had custody and that Mother also had purchased birthday gifts, paid to take the Child shopping and to eat, and brought small knickknack gifts to the Child. However, Aunt testified that Mother had visited only at Petitioners' home since April 2018. Tennessee Code Annotated § 36-1-102(1)(D) requires that a parent provide more than token payments toward the Child's financial support. Upon a review of the record, the evidence does not preponderate against the Trial Court's finding that Mother had failed to provide more than token financial support for the Child during the four months prior to the filing of the termination petition.

Additionally, Mother argues that the Trial Court erred by determining that any failure to support by her was willful. We note that the burden was on Mother to prove that her lack of financial support for the Child was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I). According to Mother, her failure to support was not willful because (1) Petitioners had not requested for her to provide financial support for the Child, (2) Mother's efforts to provide support had been rebuffed by Petitioners, (3) Mother had provided in-kind support, (4) Mother lacked an ability to support, (5) there was no court order requiring support, and (6) there was no evidence that anyone explained to Mother the consequences of her failure to support.

The absence of a court order requiring a parent to pay child support does not negate that parent's obligation to pay support. *See In re M.A.C.*, No. M2007-01981-COA-R3-PT, 2008 WL 2787763, at *5 (Tenn. Ct. App. July 17, 2008) ("Though Mother was not under a court order setting support for her children, such an order is not required."). Tennessee Code Annotated § 36-1-102(1)(H) provides that every parent eighteen years old or above is presumed to have knowledge of the legal obligation to financially support his or her children. Furthermore, Mother argues that she had provided in-kind support by gifts and other items for the Child and that even if such support occurred outside the four-month period, it could be considered for purposes of willfulness. Mother claims that her efforts to support were rebuffed by Petitioners, but Aunt testified that she had only asked Mother to stop bringing knickknack gifts for the Child due to the Child's behaviors. Although Mother claims that DCS had not explained to her the consequences of her failure to support the Child, the petition for custody filed by DCS in the dependency and neglect proceedings reflects that notice was provided to both parents that their failure to visit or support the Child could constitute abandonment and lead to the termination of their parental rights.

Mother further argues that she could not afford to pay support. However, the Trial Court found such testimony by Mother concerning her willfulness not to be credible. As our Supreme Court has instructed:

> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011). There exists no clear and convincing evidence in the record sufficient for us to overturn the Trial Court's credibility determinations.

The Trial Court found that Mother had continued "paying all of her other obligations which included a cell phone bill and medications" and that there was no indication in the record where the money for these expenses came from except her work "as an artist and other odd jobs." The Trial Court found that Mother's testimony that she was unable to pay some amount of financial support for the Child during the relevant four months to not be credible. We find and hold, as did the Trial Court, that Mother failed to establish by a preponderance of the evidence that her failure to support the Child was not willful. We, therefore, affirm the Trial Court's judgment concerning this ground for the termination of Mother's parental rights.

As to Father, the Trial Court found that Father had not supported the Child during the relevant four-month period. Father argues that he had provided in-kind support for the Child by providing necessities and gifts through the grandmother. Father also averred that he had filed a petition to regain custody of the Child. Due to those actions by Father, he claims that the Trial Court erred by finding that he had failed to support the Child. Aunt, however, testified that Father had not paid support for the Child during the four-month period. It is undisputed that during the relevant four-month period, Father provided the Child with a birthday gift, a "power wheel dune buggy," which was valued at $300. Despite purchasing this gift for the Child, Father acknowledged that the gift was not financial support for the Child. The Trial Court ultimately found that Father had failed to support the Child from May 14, 2018, through September 13, 2018. The evidence does not preponderate against the Trial Court's finding that Father had failed to provide financial support for the Child during the relevant four-month period.

Father further argues that his failure to support was not willful. In support of his argument, Father states that (1) Petitioners had not requested monetary support from him, (2) his efforts to support the Child were rebuffed by Petitioners when he suggested a court order establishing child support and he was "actively seeking to reestablish his rights and responsibilities in court," (3) he provided monetary payments and in-kind support to the grandmother during the four-month period, (4) Father did not have the ability to pay support for the Child, (5) there is no court order requiring child support, and (6) there is no evidence that anyone explained to Father the consequences of his failure to visit.

As we noted above, a court order is not required for the ground of abandonment by failure to support, and a parent who is eighteen years old or older is presumed to have knowledge of their legal obligation to support their children. *See* Tenn. Code Ann. § 36-1-102(1)(H) (2017); *In re M.A.C.*, No. M2007-01981-COA-R3-PT, 2008 WL 2787763, at *5 (Tenn. Ct. App. July 17, 2008). Also, despite Father claiming he had no knowledge of the consequences of his failure to support, the custody petition filed by DCS in the

dependency and neglect action provided Father with notice that his failure to support the Child could be used as a ground for termination of his parental rights.

Father argues that Petitioners had not requested that he pay financial support for the Child, that Petitioners had rebuffed his effort to pay support when he had requested court-ordered child support, and that he was seeking to reestablish his rights with his petition for custody. Aunt testified that she would sometimes send text messages to Father about money for the Child and that Father would bring money to her. Aunt acknowledged that she stopped sending messages to Father requesting money and stated that she did not "feel like [she] should have to ask for money." Father testified that he had suggested to Aunt that they should have a child support hearing to set support so there would be a "documented number" for him to pay as support. According to Father, Aunt declined and informed Father "that she was not making [Father] pay child support as a favor to [Father] to help [him] get on [his] feet." Aunt denied any such conversation with Father had occurred. Father testified that Aunt never subsequently instructed Father to pay support for the Child or informed him of anything she needed. Again, Father is presumed to know he has an obligation to financially support the Child. We find insufficient proof in the record to support Father's argument that Petitioners prevented Father from providing financial support for the Child.

Although Father argues he was unable to afford to pay support, the Trial Court recognized that Father was employed and earning a good income during the four-month period. Father testified that he could not afford both to support the Child and to pay his legal fees to pursue custody. Father testified that during the four-month period, he made $19.04 per hour for forty hours a week while working in Georgia. According to Father, his wife had been sick and hospitalized during her pregnancy but denied that he had lost any income or missed work due to the illness. We note that during the relevant four-month period, Father was able financially to provide the Child with an extravagant birthday gift, for which he had paid approximately $300, but argues that he was unable to afford to pay monetary support to Petitioners for the Child's care. The Trial Court found that Father made the decision to pay other obligations, including "rent to his wife" instead of paying support for his Child. We find and hold, as did the Trial Court, that Father failed to prove by a preponderance of the evidence that his failure to support the Child was not willful. We, therefore, affirm the Trial Court's judgment concerning this ground.

We next address Mother's issue concerning the statutory ground of failure to manifest an ability and willingness to assume custody or financial responsibility of the Child. According to Mother, "Petitioner[s] submitted no proof" to support this ground for termination of Mother's parental rights. We disagree. Tennessee Code Annotated § 36-1-113(g)(14) (Supp. 2019) provides as follows as a ground for the termination of parental rights:

A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

As the Trial Court found, Mother was unable to care for the Child at the time of trial. The Trial Court further found that mother struggled to care even for just herself and that, at the time of trial, was not capable of caring for the Child without help from others. Mother acknowledged that she was not requesting custody of the Child and testified that "it would be best to get [her]self established more" before assuming custody of the Child. Although Mother testified that she had a disability, she stated that she was able to work. Mother testified that she was not working between May 14, 2018, and September 13, 2018, due to suffering from anxiety and depression caused by rheumatoid arthritis and fibromyalgia. Mother testified, however, that she was able to work and earn minimal income as an artist or at other odd jobs. At the time of trial, Mother testified that she did not have her own apartment and wanted to have one before requesting custody of the Child. Although Mother had purchased small presents for the Child regularly, Aunt testified that Mother had not paid financial support for the Child. Petitioners presented clear and convincing evidence that Mother had not manifested either an ability or a willingness to assume custody or financial responsibility of the Child. By the same quantum of proof, the Trial Court further found that placing the Child in Mother's custody would cause a risk of substantial harm to the Child due to Mother's inability to care for the Child. We find and hold, as did the Trial Court, that Petitioners proved this ground by clear and convincing evidence.

Finally, having determined that grounds exist for the termination of Mother's and Father's parental rights, we next address the parents' argument concerning the best interest analysis. Both parents argue that the Trial Court erred in finding by clear and convincing evidence that termination of their respective parental rights was in the Child's best interest. Tennessee Code Annotated § 36-1-113(i) provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

(i)     In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

- 25 -

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2019).

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the

- 26 -

termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its best interest analysis, the Trial Court considered each of the enumerated factors in Tennessee Code Annotated § 36-1-113(i). In their argument, Mother and Father

- 27 -

point to the Trial Court's order requiring that Petitioner enter into an agreed order or a "preadoption contract" to continue the parents' relationship with the Child by allowing reasonable visitation, wherein the Trial Court found that such continued visitation was in the Child's best interest. The parents argue that if the Trial Court believed continuing the parents' visitation relationship with the Child was a goal, it should have declined to terminate the parents' rights to the Child "as it plainly did not believe relegating [Mother and Father] to the role of strangers was in the best interest of the child." However, the Trial Court's finding concerning a "preadoption contract" or agreed order providing for reasonable visitation after the adoption does not outweigh its decision as to the statutory factors which the Trial Court ultimately found weighed in favor of the termination of the parents' rights.

Concerning Father, the Trial Court recognized that he had made improvements to his life and that he was now in a position to be able to care for the Child. The Trial Court also found that the factor concerning Father's mental health weighed against the termination of his parental rights. However, Father had not maintained visitation with the Child and at the time of the trial, did not have a meaningful relationship with the Child. The Trial Court further found that Father had neglected the Child in the past and had not paid child support for the Child. The Trial Court further recognized the relationship between the Child and Petitioners, as well as Petitioners' children residing in the home, and the "very negative effect" on the Child if the Child's caretakers or physical environment changed.

As relevant to Mother, the Trial Court found that Mother had maintained regular visitation with the Child and considered Mother's meaningful relationship with the Child, both of which weighed against the termination of her parental rights. The Trial Court also found that the factor concerning Mother's mental health weighed against the termination of her parental rights. The Trial Court, however, found that Mother had not made a change in circumstances such that she could safely assume custody of the Child and that she had neglected the Child in the past. The Trial Court also found that Mother had not paid child support for the Child and that this lack of support weighed in favor of the termination of her parental rights. The Trial Court also considered the "very negative effect" on the Child if there was a change in caretakers for her.

Overall, the Trial Court found that the relevant factors weighed in favor of the termination of both parents' rights to the Child. In making its decision, the Trial Court found that the most important factor concerned Petitioners' stability, nurturing, and dependability that they were able to provide to the Child, particularly that of Aunt. The evidence presented does not preponderate against the Trial Court's findings concerning the best interest factors, and the Trial Court's findings are clear and convincing evidence that termination of Mother's and Father's parental rights was in the Child's best interest. As such, we affirm the Trial Court's termination of both Mother's and Father's parental rights to the Child.

Finally, we address Petitioners' issue concerning the Trial Court's order requiring that the parties submit to an agreed order or a "preadoption contract" allowing for reasonable visitation to continue the visitation relationship between the parents and the Child. Petitioners argue that the Trial Court erred by mandating such an agreed order or contract. In their brief, the parents also question the Trial Court's authority to require such an order.

Tennessee Code Annotated § 36-1-121(f) (Supp. 2019) states that "[a] final order of adoption of a child cannot require the adoptive parent to permit visitation by any other person, nor can the final order of adoption place any conditions on the adoption of the child by the adoptive parent." The Trial Court's requiring the parties to enter into an agreed order as part of the adoption proceedings directly conflicts with such prohibition in section 36-1-121(f).

We note, however, that this statute does not prohibit the parties from entering into a contract for post-adoption contact as provided in Tennessee Code Annotated § 36-1-145 (Supp. 2019). *See* Tenn. Code Ann. § 36-1-121(f) (Supp. 2019). A trial court also may enforce or modify a contract for post-adoption contact already entered into by the parties. *Id.* Tennessee Code Annotated § 36-1-145 specifically allows adoptive parents to "voluntarily enter into" a contract with a biological parent, and a child if the child is over the age of fourteen years old, permitting continued contact between the child and his or her relatives after the adoption is finalized.[6] This contract for post-adoption contact must be in writing and is enforceable. *See* Tenn. Code Ann. § 36-1-145(c) (Supp. 2019).

The issue of whether a trial court can order a party to enter into a contract for post-adoption contact is a matter of first impression. As with any contract, a contract for post-adoption contact is valid only if entered into voluntarily. *See Cummings Inc. v. Dorgan*, 320 S.W.3d 316, 331 (Tenn. Ct. App. 2009) ("[A] contract is valid only if it is entered into freely, with the voluntary assent of the parties making it."). In fact, Tennessee Code Annotated § 36-1-145 allows the adoptive parents and biological parents to "voluntarily enter into" such a contract for post-adoption contact. We acknowledge that Aunt testified during trial that she intended to allow a continuing relationship between the Child and the biological parents after adoption. Even so, the Trial Court's order requiring the parties in this case to enter into a contract allowing visitation after the adoption in order to continue the visiting relationship between the Child and the biological parents is hardly voluntary. A parties' testimony of intent to allow continued contact is much different than a legally binding contract requiring such contact. While we understand what the Trial Court was attempting to do and why, we agree with Petitioners that the Trial Court did not have the

_____

[6] The adopted child is a necessary party to the contract only if the Child is over the age of fourteen and is deemed to have the capacity to enter into such a contract at the age of fourteen. *See* Tenn. Code Ann. § 36-1-145(a) (Supp. 2019).

authority to require the parties to enter into a contract for post-adoption contact. We, therefore, reverse the Trial Court's judgment as to this requirement.

## **Conclusion**

The judgment of the Trial Court terminating Mother's and Father's parental rights to the Child is affirmed, as modified. This cause is remanded to the Trial Court for collection of the costs assessed below. The costs on appeal are assessed against the appellants, Scott W. and Sarah E., and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE